**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sharon DUNNIGAN, Defendant–**
**Appellant.**

**No. 90–5668.**

United States Court of Appeals,
Fourth Circuit.

Argued April 12, 1991.

Decided Aug. 30, 1991.

As Amended Sept. 12, 1991.

---

Brent E. Beveridge, Morgantown, W.Va., argued for defendant-appellant.

Michael M. Fisher, Asst. U.S. Atty., argued (Michael W. Carey, U.S. Atty., Hunter P. Smith, Asst. U.S. Atty., on brief), Charleston, W.Va., for plaintiff-appellee.

Before HALL and PHILLIPS, Circuit Judges, and WILLIAMS, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

K.K. HALL, Circuit Judge:

Sharon Dunnigan appeals her conviction and sentence for conspiracy to distribute cocaine. We affirm her conviction; however, we vacate her sentence and remand for resentencing.

### I.

The cocaine distribution conspiracy in this case is not complex. Freddie Harris was a notorious cocaine dealer in the Charleston, West Virginia, area. His ring was broken up in the late summer of 1988. Harris pled guilty to cocaine distribution charges, as did his coconspirators John Dean, Doris Casto, Wynema Brown, and Tammy Moore. Several others went to trial, including Andre Charlton and, later, appellant Sharon Dunnigan.

Dunnigan was charged March 7, 1989, in a one-count indictment, with conspiracy to distribute cocaine with Harris and unnamed others during the summer of 1988. She filed pretrial motions to dismiss the indictment, for a bill of particulars, and for disclosure of exculpatory and Jencks Act material.

At a hearing on the motions, the government agreed to provide Jencks Act material, notice of "similar acts" evidence, and information regarding any confidential informants. The defendant withdrew her motion for a bill of particulars. The district court denied the motion to dismiss the indictment.

Between the hearing on motions and trial, the government furnished grand jury transcripts, plea agreements and rap sheets for proposed government witnesses, and notice of one "similar act"—a controlled sale of crack cocaine by Dunnigan to a cooperating witness, Edward Dickerson, on July 12, 1988.

Trial was held January 3–4, 1990. The government presented five witnesses in its case-in-chief. Harris, the ringleader, was first. He testified that Dunnigan was his source of supply in Cleveland, and that she had travelled to Cleveland alone and with him to obtain cocaine during the summer of 1988. Harris also stated that Dunnigan had accompanied Dean to Cleveland for the same purpose at least once. Harris admitted distributing the cocaine in the Charleston area.

Dean took the stand next. Dean met the appellant when, on Harris' instructions, he picked her up at the Charleston bus terminal and took her home. Harris had described Dunnigan to Dean as his "connect." Later that evening, Dean accompanied Harris to Dunnigan's apartment; Harris went inside and obtained cocaine, which Dean then helped package for resale. Dean also testified that he went to Cleveland with Dunnigan on several occasions to purchase cocaine and dilaudid. At the close of Dean's direct examination, the government elicited from him that he was a paranoid schizophrenic and heroin addict.

Dunnigan's counsel was surprised by this revelation. He protested to the court that his cross-examination would be hampered by the government's failure to provide this information before trial notwithstanding a specific discovery request. The government argued that the grand jury transcripts revealed that Dean was a heroin addict, and that it had no documentary evidence to substantiate Dean's mental illness. The district court advised the defendant that Dean's schizophrenia could be inquired into on cross-examination. Dunnigan's trial counsel nonetheless asked no cross-examination questions about Dean's addiction or mental disorders.

Charlton testified next. He said that he had gone with Harris to Dunnigan's apartment to test and package cocaine Dunnigan had brought from Cleveland. He also recounted one occasion on which he had received cocaine from Dean. This cocaine had been picked up in Cleveland on one of Dean and Dunnigan's trips together.

Moore was the fourth coconspirator witness. She told of conversations with Dunnigan during which Dunnigan extolled the superior quality of Cleveland cocaine and attempted to solicit Moore to drive her to Cleveland.

Finally, the government called Brown. She stated that Dunnigan had told her of the Cleveland cocaine-purchasing trips, and that she had seen cocaine in Dunnigan's apartment. On four or five occasions, Brown observed Dunnigan's daughter "rocking up" powder cocaine (i.e. making it into crack) for Dunnigan. Dunnigan would later return the crack cocaine to her daughter to sell. Brown also stated that Dunnigan kept cocaine in a little tin case. The defendant made no objections to any of Brown's testimony and pursued no cross-examination. Notwithstanding this lack of protest, the district court gave a "similar acts" instruction—if the jury believed the cocaine that Dunnigan's daughter "rocked up" was part of the conspiracy, it could consider it for that purpose; however, the court stated, Dunnigan was not charged with distributing crack, and if the cocaine from which it was made was outside the

conspiracy, the jury could only consider the evidence for the limited purposes of Fed. R.Evid. 404(b): motive, intent, preparation, lack of mistake, and knowledge.

The government rested, and Dunnigan presented a simple defense. She took the stand and denied everything. She testified that she did not buy, sell, or use cocaine during the time she knew Harris. She said that she did not know anyone in Cleveland who used cocaine.

She admitted going to Cleveland, but only to visit relatives. She said that she went to Cleveland with Harris once, because she knew her way around, but she did not know whether Harris bought or tried to buy any cocaine on that trip. She flatly denied the trips and transactions described by Dean and Charlton, and she had no knowledge of anyone making cocaine into crack at her apartment.

On cross-examination, the government asked her about a specific transaction: whether she had sold crack to Edward Dickerson on July 12, 1988, at her apartment. She denied it.

The defense rested, and the government began a devastating rebuttal. Dickerson was the first witness. He testified that he had been arrested in early 1988 and had become an informant. On July 12, 1988, in a monitored transaction, he bought crack from Dunnigan at her apartment. Dunnigan did not object to this testimony.

Moore then retook the stand to describe her purchases of crack cocaine from the defendant. She had also seen Dunnigan give crack and powder cocaine to her daughter. Finally, Moore said that she and Dunnigan's daughter sold crack together and returned part of the money to Dunnigan. Again, the defendant did not object to any of Moore's story. Again, the district court gave the jury a "similar acts" limiting instruction.

The jury found Dunnigan guilty. Her base offense level for sentencing was 22. She did not receive the two-level acceptance of responsibility reduction, because she continued to maintain her innocence. Moreover, the district court increased the offense level by 2 to 24 for "obstruction of

justice," based on its finding that Dunnigan testified untruthfully at her trial. She was sentenced to 51 months, the lowest end of the guideline range.

## II.

Dunnigan first argues that the district court erred by denying her motions to dismiss the indictment and for a bill of particulars. These arguments are related, because a bill of particulars is a defendant's means of obtaining specific information about charges brought in a vague or broadly-worded indictment. *United States v. Debrow*, 346 U.S. 374, 378, 74 S.Ct. 113, 115, 98 L.Ed. 92 (1953).

■ An indictment may simply be a short, plain statement of the charge, sufficiently precise to notify the defendant of the accusation he must meet and to protect him from double jeopardy. *United States v. American Waste Fiber Co.*, 809 F.2d 1044, 1046 (4th Cir.1987). The indictment of Dunnigan was sufficient. It identified the time frame of the activity (early to late summer of 1988), the place (at or near Charleston), a coconspirator (Harris), the controlled substance involved, and the statutes violated. The indictment tracked the statutory language defining the offense and apprised Dunnigan that other unnamed coconspirators, whose identities were known and unknown to the grand jury, were involved.

Among her pretrial motions, Dunnigan moved for a bill of particulars. She wanted the names of those to whom she had allegedly sold cocaine, notice of any "similar acts" the government planned to use, and the like. At a pretrial hearing on the motions, Dunnigan's counsel was satisfied with the government's proposed disclosures and specifically dropped the request for a bill of particulars. Waivers are rarely more explicit. In any event, Dunnigan was given the names of the government's witnesses and received grand jury transcripts. The denial of a bill of particulars did not leave her facing a trial unaware of the nature of the charges against her.

182

## III.

 Ordinarily, proof of crimes or bad acts other than those charged is inadmissible to show that the defendant acted in conformity with a character trait. However, evidence of such acts is admissible for limited collateral purposes such as knowledge, intent, motive, absence of mistake, and common scheme or plan. Fed.R.Evid. 404.

Dunnigan now argues that she was hopelessly prejudiced by admission of the testimony that she helped her daughter use and sell crack cocaine. We do not doubt that this testimony was very damaging; however, Dunnigan made no objections to this evidence at trial, and the court may reverse only if admission of the evidence was plain error.

All of the "similar acts" evidence presented on rebuttal was invited by Dunnigan. She denied using cocaine or knowing that anyone sold cocaine out of her house. The government was entitled to rebut these assertions.

A closer issue is Brown's testimony in the government's case-in-chief about Dunnigan giving her daughter cocaine to "rock up." Nonetheless, Dunnigan did not object, and the district court *sua sponte* gave a limiting instruction. Admitting the testimony with a limiting instruction does not rise to plain error, if error at all.

## IV.

 The government now admits, albeit equivocally, that it should have disclosed Dean's schizophrenia before trial. "If Dean's mental condition was such that it would have reflected adversely on his credibility, the United States should have provided this information to the defendant." Brief of the United States, at 39.[1] However, every *Brady*[2] violation does not

warrant reversal. Only where the evidence is so material that its nondisclosure undermines confidence in the verdict is reversal necessary. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Dunnigan did not request a continuance and did not ask a single question on cross-examination about Dean's condition. Moreover, though the exculpatory evidence may not have been presented as fully as Dunnigan would have liked (though she does not say what else she would now offer), the jury did in fact hear it. Dunnigan would have a better argument if the government had withheld the information from the jury. Finally, Dean was one of a half-dozen government witnesses telling the same story; his testimony was important, but not vital.

Our confidence in the verdict is not undermined by the nondisclosure of Dean's mental problems. Therefore, any *Brady* error was harmless.

## V.

## A.

 The district court found that Dunnigan had testified untruthfully at trial, and so enhanced her offense level by two for "obstruction of justice." Committing or suborning perjury has always been identified as "obstruction of justice" in the Guidelines Commentary. U.S.S.G. § 3C1.1, comment. (n.1(c)) (Nov.1989); *Id.,* comment. (n.3(b)) (Nov.1990).

At the time Dunnigan was charged, convicted, and sentenced, Application Note 3 to U.S.S.G. § 3C1.1 stated: "This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt is not a basis for application of this provision." Furthermore, Application Note 2 stated that "sus-

---

1. The Assistant U.S. Attorney on appeal did not represent the government at trial. The trial prosecutor interpreted her duty to disclose exculpatory information to apply only to documentary evidence.

2. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

pect testimony and statements should be evaluated in a light most favorable to the defendant." [3]

All circuits that have considered the issue have upheld the constitutionality of similar enhancements under § 3C1.1. These decisions are based on the premise that a defendant's right to testify in his own behalf is not a license to commit perjury. *United States v. Batista–Polanco,* 927 F.2d 14, 22 (1st Cir.1991); *United States v. Matos,* 907 F.2d 274, 276 (2nd Cir.1990); *United States v. Acosta–Cazares,* 878 F.2d 945, 953 (6th Cir.), *cert. denied,* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *United States v. O'Meara,* 895 F.2d 1216 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); *United States v. Barbosa,* 906 F.2d 1366, 1369 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990); *United States v. Keys,* 899 F.2d 983 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 160, 112 L.Ed.2d 125 (1990); *United States v. Wallace,* 904 F.2d 603, 604–605 (11th Cir.1990).

### B.

Our sense of justice requires us to disagree. We of course have no desire to condone or encourage perjury. On the other hand, we fear that this enhancement will become the commonplace punishment for a convicted defendant who has had the audacity to deny the charges against him. The government maintained at oral argument that every defendant who takes the stand and is convicted should be given the obstruction of justice enhancement. Certainly, if the guidelines are to be applied consistently, the government would be right. Nearly all testifying defendants tell a story that, if believed in full, would result in acquittal. The jury's verdict implies a disbelief of some material aspect of the defendant's testimony.

It disturbs us that testimony by an accused in his own defense, so basic to justice, is deemed to "obstruct" justice unless the accused convinces the jury. The facile logic of hindsight deems such disbelieved testimony a lie; inasmuch as there is no right to lie, there is no harm in sanctioning it. Hindsight, however, does not help the accused when he must decide whether to take the stand. He already knows that he faces the possibility of conviction, and that he is much less likely to be acquitted if he remains silent, despite his right to do so and even in the face of instructions to the jury to draw no adverse inference from his silence. Kassin, The American Jury: Handicapped in the Pursuit of Justice, 51 Ohio St.L.J. 687, 700 (1990), *citing* Shaffer & Case, On the Decision Not to Testify in One's Own Behalf: Effects of Withheld Evidence, Defendant's Sexual Preferences, and Juror Dogmatism on Juridic Decisions, 42 J. Personality & Soc. Psychology 335, 344 (1982); Note, The Influence of the Defendant's Plea on Judicial Determination of Sentence, 66 Yale L.J. 204, 212 n. 36 (1956). *See Lakeside v. Oregon,* 435 U.S. 333, 340 n. 10, 98 S.Ct. 1091, 1095 n. 10, 55 L.Ed.2d 319 (1978) (adverse inference from silence "may be inevitable"). Moreover, the dilemma does not arise solely when the defendant is guilty; there are many reasons unrelated to guilt that may militate against testifying. Chief among these is the prosecution's power to impeach the defendant's credibility with prior convictions under Fed. R.Evid. 609. *Carter v. Kentucky,* 450 U.S.

---

**3.** Effective November 1, 1990, the substance of former Application Notes 2 and 3 were amalgamated into new note 1:

This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision, the defendant's testimony and statements should be evaluated in a light most favorable to the defendant.

The primary purpose of the 1990 amendment was to add a new guideline governing "reckless endangerment during flight." The other changes, including the one described above, were intended only for clarification. United States Sentencing Commission, *Guidelines Manual,* Appendix C, amendment 347 (Nov.1990).

288, 300 n. 15, 101 S.Ct. 1112, 1119 n. 15, 67 L.Ed.2d 241 (1981); *Wilson v. United States,* 149 U.S. 60, 66, 13 S.Ct. 765, 766, 37 L.Ed. 650 (1893); Bradley, *Griffin v. California: Still Viable After All These Years,* 79 Mich.L.Rev. 1290, 1295 n. 25.[4] We cannot help but note that an innocent defendant with prior convictions must weigh the jury's likelihood of drawing one impermissible inference (guilt by silence) against another (guilt by criminal propensity) in deciding whether to testify. With an automatic § 3C1.1 enhancement added to the ante, the defendant may not think testifying worth the risk.[5]

### C.

Several of our fellow circuits have relied upon *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), a preguidelines case, as controlling and permitting this enhancement. Some have explicitly stated that the guidelines have not altered the analysis. *E.g., Barbosa,* 906 F.2d at 1369; *United States v. Beaulieu,* 900 F.2d 1537 (10th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3252, 111 L.Ed.2d 762 (1990). We believe that a close look at *Grayson's* rationale reveals that the guidelines have removed important underpinnings of the Court's analysis.

The most basic difference in *Grayson* is the stated justification for enhancing sentence. The guidelines deem a denial of guilt on the stand "obstruction of justice." There is no such rationale in *Grayson. Grayson* rejected an argument that due process prohibits consideration at sentencing of the defendant's untruthfulness, because it amounts to punishment for perjury without indictment and trial for perjury. The Court acknowledged that punishment for perjury to save the government the time and expense of prosecution would be "impermissible," but refused to prohibit the "otherwise *permissible* practice of con-

sidering a defendant's untruthfulness for the purpose of illuminating his need for rehabilitation and the society's need for protection." 438 U.S. at 53, 98 S.Ct. at 2617.

The Court was speaking during the long period of our judicial history when district courts enjoyed broad discretion in imposing any sentence within statutory limits. It found that the very uncertainty of a defendant's supposedly untrue trial testimony being considered at sentencing was a defense against Grayson's constitutional attack:

> Nothing we say today requires a sentencing judge to enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false. Rather, we are reaffirming the authority of a sentencing judge to evaluate carefully a defendant's testimony on the stand, determine—with a consciousness of the frailty of human judgment—whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society. Awareness of such a process realistically cannot be deemed to affect the decision of an accused but unconvicted defendant to testify truthfully in his own behalf.

*Grayson,* 438 U.S. at 55, 98 S.Ct. at 2618. The guidelines supply precisely the "wooden or reflex" enhancement disclaimed by the Court. A defendant who stands trial has already probably passed up an opportunity, through a negotiated plea, for a lesser charge and sentence. At trial, he must choose between remaining silent, with a heavy risk of conviction, and testifying on pain of facing an enhanced sentence. At

---

**4.** Bradley cites statistics from Kalvin & Zeisel, The American Jury 146 (1966), that defendants without prior records are 37% more likely to testify than those with previous convictions. *Id.*

**5.** For example, the enhancement increased Dunnigan's guidelines range from 41–51 to 51–63 months. At the highest offense levels, the increase is more drastic, from 292–365 months to 360–life.

every turn, he is encouraged to forfeit his rights, and is subjected to increased punishment for refusing to do so. When deciding to testify, he is not simply "aware" of a "process" that might take his untruthfulness into account, he is (and ought to be advised by his counsel) aware that the very fact of his testifying will be used against him if he is convicted.

We are not satisfied that there are enough safeguards in place to prevent this enhancement from unfairly coercing defendants, guilty or innocent, into remaining silent at trial. Other circuits have reviewed the district court's finding of untruthfulness under a "clearly erroneous" standard. *Batista–Polanco*, 927 F.2d at 22; *Matos*, 907 F.2d at 276; *Wallace*, 904 F.2d at 605; *Beaulieu*, 900 F.2d at 1540; *O'Meara*, 895 F.2d at 1220. Of course, in light of the jury's verdict of guilt, the district court's finding will never be "clearly erroneous" where the verdict is sustainable; if the verdict cannot be supported, the sentencing finding will of course be moot. Our review of these enhancements would therefore be an empty ritual.

We are similarly unimpressed with the guidelines' admonition to district courts to view the defendant's testimony "in a light most favorable to the defendant." Whatever light is held to it, a defendant's testimony that has been apparently rejected in material respects by a jury will almost always compel a finding of untruthfulness. If the district court does not so find, the "clearly erroneous" standard of review may actually be tested, but, of course, on the government's appeal.

### D.

We who have been schooled and immersed in our system of law are perhaps too quick to make the jury an infallible icon and a witness' oath a sacred rite; we ignore the human infirmities that flaw both. In short, our love of our system easily produces a chauvinistic faith in its perfection.

Nearly twenty years ago, in announcing this circuit's rule permitting, as *Grayson* later did, consideration of a defendant's perjury in setting an indeterminate sentence, Judge Butzner cautioned us to remember these frailties.

[S]entencing judges should not indiscriminately treat as a perjurer every convicted defendant who has testified in his own defense. Witnesses induced by sordid motives or fear have been known to fabricate accusations with such guile that even conscientious triers of fact have been misled. Moreover, some essential elements of proof of criminal conduct, such as knowledge, intent, malice, and premeditation are sometimes so subjective that testimony about them cannot be readily categorized as true or false. Judges must constantly bear in mind that neither they nor jurors are infallible. A verdict of guilty means only that guilt has been proved beyond a reasonable doubt, not that the defendant has lied in maintaining his innocence.

*United States v. Moore*, 484 F.2d 1284, 1287–1288 (4th Cir.1973).

The rigidity of the guidelines makes the § 3C1.1 enhancement for a disbelieved denial of guilt under oath an intolerable burden upon the defendant's right to testify in his own behalf. Consequently, though we affirm Dunnigan's conviction, we remand for resentencing without the enhancement for obstruction of justice.

*CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED.*