**UNITED STATES of America, Appellee,**

v.

**Peter JOHNSON, Defendant–Appellant.**

**No. 1548, Docket 92–1082.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1992.

Decided June 25, 1992.

Lorin L. Reisner, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Michael E. Horowitz, Miguel A. Estrada, Asst. U.S. Attys., S.D.N.Y., of counsel), for appellee.

Abraham L. Clott, Legal Aid Soc., Federal Defender Services Appeals Unit, New York City, for defendant-appellant.

Before PRATT and ALTIMARI, Circuit Judges, and Daniel M. FRIEDMAN, Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

A jury concluded that Peter Johnson had used intimidation and threatened two people with the intent to cause them to withhold testimony from an official proceeding, in violation of 18 U.S.C. § 1512(b)(2)(A). Johnson now appeals from the judgment of conviction and sentence entered on that verdict in the United States District Court for the Southern District of New York, Pierre N. Leval, *Judge.* Johnson's principal claim is that the district court's charge improperly nullified the statutory affirmative defense contained in 18 U.S.C. § 1512(d) by requiring him to disprove, by a preponderance of the evidence, the same conduct that the government was required to prove beyond a reasonable doubt. He also appeals his sentence. For the reasons that follow, we reject Johnson's contentions and affirm the judgment of the district court.

## FACTS AND BACKGROUND

At the time of his arrest, on February 22, 1991, Johnson was employed by the United States Post Office in the Bronx, New York, where he operated a sorting machine. The complaint underlying his arrest charged him with stealing New York Giants football playoff tickets which had been sent to an address within the 10475 zip code, an area of the Bronx for which Johnson was assigned to sort mail. The complaint also disclosed that Joseph Maydwell, an insurance salesman in Westchester County, New York, who attempted to use the stolen tickets, had identified Johnson as the source of the tickets.

On March 21, 1991, Johnson, accompanied by a six-foot-plus-tall man wearing long black gloves, visited Maydwell's insurance office in New Rochelle, New York. Johnson pointed Maydwell out to his associate, and said: "Remember this guy's face, remember his face, because if something

happens to me I want you to take care of this guy." Johnson then told Maydwell that he had "better go to the postal inspector and change [his] story and tell them that [he] didn't know what [he] was talking about". Johnson further informed Maydwell that

> [i]f I get indicted and you testify, I'm going to take care of you, I'm going to get you. You don't know what you're dealing with. But if you don't, everything will be fine, everything will be okay.

Johnson also told Maydwell that he had "guns and he could take care of it any time."

Maydwell's secretaries, Monique Smith and Lucretia Siaharis, witnessed this encounter. Before he left, Johnson approached Smith, and in a tone described by Smith as "threatening" and "very harsh", told her: "Sister, the 2 or $300 that you're making here is not worth it. Because whatever goes down, and whoever is here is going down with it." Later that same evening, Johnson returned to Maydwell's office, but only Smith was still at work. After she told Johnson that Maydwell was not there, Johnson shook his head and told Smith: "Sister, I'm telling you, it's not worth it."

At trial, Johnson called Richard Mirando, a tattoo artist, who testified that he had been tattooing Johnson at the same time that the government claimed he had made the later threatening statements to Monique Smith. Johnson also argued to the jury that although he and Maydwell had had words in their earlier encounter, the incident had been "blown out of proportion". Johnson further argued that he had carried his burden of proof under the affirmative defense to the witness-tampering statute. Although the jury acquitted Johnson on the underlying mail-theft count, the jury convicted him of two counts of witness-tampering based on his separate threats of Smith and of Maydwell.

At sentencing, the government introduced transcripts of phone calls Johnson had made to Mirando from jail. The government argued that these transcripts showed that Johnson had suborned perjury in encouraging Mirando's trial testimony. Judge Leval calculated Johnson's base offense level as 24, a figure which included a two-point enhancement for suborning perjury, as allowed by U.S.S.G. § 3C1.1 (obstruction of justice), and imposed a guideline sentence of 72 months' imprisonment.

## DISCUSSION

### A. *The witness-tampering convictions.*

Johnson's first contention is that the district court's charge on the witness-tampering counts was both erroneous as a matter of statutory interpretation and violative of due process.

#### 1. The statute and the jury charge.

Section 1512 of title 18 of the United States Code was passed by congress as part of the Victim and Witness Protection Act, Pub.L. No. 97–291, 96 Stat. 1248 (1982), which sought to strengthen the then-existing legal protections for victims and witnesses of federal crimes. *See United States v. Hernandez*, 730 F.2d 895, 898 (2d Cir.1984) (quoting S.Rep. No. 532, 97th Cong., 2d Sess. 9, *reprinted in* 1982 U.S.C.C.A.N. 2515). Recognizing that the law up to that point had given a witness or potential witness "little hope of protection from the government if he is harassed [*sic*] or threatened by the defendant", 1982 U.S.C.C.A.N. at 2516, and further noting that the absence of such protections was "a tragic failing in our criminal justice system, one which hurts the whole society", *id.*, congress included a prohibition on tampering with witnesses, a provision which is now codified at 18·U.S.C. § 1512.

Johnson was convicted of two counts of violating subparagraph (b)(2)(A) of that section. That subparagraph reads, in pertinent part:

> (b) Whoever knowingly uses intimidation or physical force, threatens * * * another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> * * * * * *
>
> (2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding * * *

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(2)(A). As the structure of § 1512 indicates, the government must prove both *conduct* and *intent*, *i.e.*, that a defendant (1) knowingly used intimidation or physical force, or threatened or attempted to do so, (2) with the intent to cause or induce any person to withhold testimony or other evidence from an official proceeding.

Congress also provided for an affirmative defense:

In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct *and* that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

18 U.S.C. § 1512(d) (emphasis added). Like the portions of § 1512 which define the offense of witness-tampering, this affirmative defense also involves both conduct and intent. To carry his burden under this subsection, a defendant must prove by a preponderance of the evidence (a) that his conduct was entirely lawful, and (b) that his sole intent was to encourage, induce, or cause the other person to testify truthfully.

Judge Leval gave a jury charge which, *inter alia*, included this language:

The first element the government must prove beyond a reasonable doubt is that the defendant threatened or intimidated someone. A threat is an expression of intention to do harm. It may be communicated by word or by gesture or by a combination of words and gestures.

The government is not required to prove that the defendant used words that expressly stated that he would do harm. It is sufficient if his words or conduct were designed to arouse fear that the defendant would do harm or cause harm to be done.

To intimidate means to discourage someone by threats or by a threatening manner or to make someone fearful. The government is not required to prove that the defendant intended to carry out the threat. Nor is the government required to prove that the person against whom the threat is made was actually frightened or actually believed he or she was in danger.

But the government must prove that the defendant's threatening words or conduct created a reasonable likelihood that the person would be in fear of harm.

\* \* \* \* \* \*

The defendant also offers a second defense in connection with Counts 3 and 4. This is a defense expressly provided by the statute—Section 1512(d). I will refer to this as the defense of truth seeking.

You must find the defendant not guilty if the defendant proves to you, by a preponderance of the evidence, two things:

(1) that the defendant's sole intention was to encourage or induce the other person to testify truthfully or not to testify falsely; and

(2) that the defendant's conduct toward the other person was lawful.

Those are the two elements of the defense of truth seeking. I will say a few more words to describe each of those two elements of the defense of truth seeking.

First, the defendant must convince you that his actions toward Maydwell or Smith on March 21 were designed to bring out the truth. If the defendant believed that Maydwell had falsely named the defendant as the person he got the Giants tickets from, and the defendant intended to induce Maydwell to tell the truth, or in any event to stop falsely naming the defendant, the defendant would satisfy this element.

The second element of the defense of truth seeking is the following. The defendant must prove by a preponderance of the evidence that his actions in seeking to bring out truthful evidence were lawful actions. He must show, in other words, that he did not engage in unlaw-

ful acts in his effort to induce witnesses to be truthful.

The government contends that by his words, tone and gestures, the defendant threatened violence and that such threats of violence constitute unlawful conduct.

\* \* \* \* \* \*

The issue is whether a normal, reasonable person to whom the defendant's conduct and language were addressed, might reasonably be put in fear of violence. If so, that was unlawful conduct.

## 2. "Lawful conduct".

■ Johnson's first challenge to the jury charge involves the interrelationship of the conduct elements of the crime and of the affirmative defense. The government argued to the jury that Johnson's conduct in threatening Smith and Maydwell constituted harassment under New York law, *see* N.Y. Penal Law § 240.25 (McKinney 1988), thus, he could not meet his burden on the first prong of the affirmative defense. Judge Leval charged the jury, based on the New York Court of Appeals' constructions of the harassment statute, *see People v. Dietze*, 75 N.Y.2d 47, 53–54, 550 N.Y.S.2d 595, 549 N.E.2d 1166 (1989) *and People v. Todaro*, 26 N.Y.2d 325, 330, 310 N.Y.S.2d 303, 258 N.E.2d 711 (1970), that if "a normal, reasonable person to whom the defendant's conduct and language were addressed, might reasonably be put in fear of violence [then] that was unlawful conduct." Johnson apparently concedes on appeal that his conduct constituted harassment, but argues that harassment, which is classified as a "violation" under New York law, *see* N.Y. Penal Law § 10.00(3) (McKinney 1987), is not sufficiently serious to be "unlawful". Specifically, he urges that a "violation" is not a "crime", a term which includes only "misdemeanors" and "felonies" in New York, *see* N.Y. Penal Law § 10.00(6) (McKinney 1987), and that since his conduct was not criminal it was necessarily "lawful" within the meaning of the statutory affirmative defense.

■ We disagree with Johnson's contentions. Since congress provided no definition of "lawful" in § 1512(d), we interpret that subsection by "giving the 'words used' their 'ordinary meaning'". *Moskal v. United States*, — U.S. —, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). Here, congress used the term "lawful conduct", which means "conformable to law" or "allowed or permitted by law". *Webster's Third New International Dictionary* 1279 (1971). *See also id.* ("LAWFUL implies law of any kind and often comes close to PERMISSIBLE"). While it may not be "seriously" unlawful in some broader moral sense, conduct which constitutes a "violation" under New York law is not "lawful conduct".

■ We are satisfied with Judge Leval's treatment of the affirmative defense. To succeed on a § 1512(d) affirmative defense, a defendant must prove that his "conduct consisted solely of lawful conduct". Read literally, this provision would require a defendant to prove that his conduct violated *none* of the panoply of state and federal laws that might apply to his situation. Recognizing the burdensome nature of proving such a negative, Judge Leval read § 1512(d) in a sensible fashion, requiring the government to come forward and articulate which federal or state statutes Johnson's conduct arguably violated. After the government had carried its "burden of production" by articulating "harassment", Johnson was better able to focus his proof, and Judge Leval was better able to craft an instruction that explained to the jury what "lawful conduct" was in the context of this case and what in particular Johnson had to prove. Judge Leval thus read the "lawful conduct" portion of the affirmative defense correctly, and the jury properly could have concluded that Johnson's conduct was not "lawful" because it violated New York's harassment statute. *Compare People v. Dorns*, 88 Misc.2d 1064, 390 N.Y.S.2d 546, 547 (Justice Ct., Town of Greenburgh, Westchester Cty. 1976) (defendant who followed victim and threatened her life properly found guilty of harassment beyond a reasonable doubt).

### 3. "Sole intention".

■ Johnson raises a similar objection to the jury charge based on the overlap between the *intent* elements of the crime and of the affirmative defense. As Johnson correctly points out, the government had to prove, beyond a reasonable doubt, that he committed certain acts "with intent to * * * cause or induce any person to * * * withhold testimony, or withhold a record, document, or other object, from an official proceeding". The affirmative defense, however, required Johnson to prove that he committed his conduct with the *sole* intention "to encourage, induce, or cause the other person to testify truthfully." Johnson argues that the interplay between these two subsections rendered the affirmative defense a nullity, since he could not have simultaneously possessed the intent to cause Smith and Maydwell to withhold evidence, and the "sole intent" to encourage truthful testimony.

We disagree. The government's burden here was to prove, beyond a reasonable doubt, that Johnson's conduct was undertaken with the intent to cause Maydwell and Smith to withhold testimony or other evidence from his trial. Once the government met its burden, however, Johnson still could have satisfied the intent prong of his affirmative defense by proving, by a preponderance of the evidence, that the evidence he wanted Maydwell and Smith to withhold was false testimony and that his conduct was therefore undertaken with the sole intent to cause them to testify truthfully or not at all. Not only is this a reasonable reading of § 1512(d), but it also comports with the Senate Judiciary Committee's view of the affirmative defense, which it noted was "intended primarily to avoid the possibility that a [judge or other officer of the court] would violate this statute by threatening a witness or potential witness with a perjury or false statement prosecution if he testifies falsely." 1982 U.S.C.C.A.N. at 2525. Under the Judiciary Committee's hypothetical, the court officer's intent would clearly be to cause the witness to withhold testimony, which would technically be a violation of § 1512(b)(2)(A), but the court officer's sole intent in doing so would be to cause the witness to withhold false testimony, thereby satisfying the affirmative defense under our reading of the statute.

Johnson's theory of the case was that his actions were intended to keep Maydwell from lying about Johnson's conduct to both the court and the government. In summation, Johnson's attorney argued that Maydwell had used Johnson as a "scapegoat" to cover up Maydwell's own illegal actions, and that Johnson's post-arrest conversations with Maydwell and Smith were designed to get Maydwell to "take back" his false accusations. Judge Leval's charge on this element of the affirmative defense—"If the defendant believed that Maydwell had falsely named the defendant as the person he got the Giants tickets from, and the defendant intended to induce Maydwell to tell the truth, or in any event to stop falsely naming the defendant, the defendant would satisfy this element"—thus embraced a proper view of the affirmative defense.

### 4. Constitutionality of 18 U.S.C. § 1512(d).

■ Johnson also contends that the district court's charge on the witness-tampering statute's affirmative defense unconstitutionally shifted the burden of proof on conduct and intent, essential elements of the crime, and required him to disprove those elements of the government's case. Again, we disagree.

■ The Supreme Court has struggled for some time with the due process problems created by affirmative defenses in criminal statutes. *See, e.g., Martin v. Ohio*, 480 U.S. 228, 233–34, 107 S.Ct. 1098, 1101–02, 94 L.Ed.2d 267 (1987); *Patterson v. New York*, 432 U.S. 197, 212–15, 97 S.Ct. 2319, 2328–30, 53 L.Ed.2d 281 (1977); *Leland v. Oregon*, 343 U.S. 790, 794–800, 72 S.Ct. 1002, 1005–08, 96 L.Ed. 1302 (1952). We may distill from these cases this constitutional principle: To be valid, an affirmative defense may not, in operation, negate an element of the crime which the government is required to prove; otherwise, there

would be too great a risk that a jury, by placing undue emphasis on the affirmative defense, might presume that the government had already met its burden of proof. Such a presumption would, without question, violate due process. *See Mullaney v. Wilbur,* 421 U.S. 684, 700–01, 95 S.Ct. 1881, 1890–91, 44 L.Ed.2d 508 (1975).

As Judge Leval construed § 1512 in his jury instructions, which we have approved, *supra,* no constitutional infirmities are presented. True, the elements of the crime and of the affirmative defense overlap, "in the sense that evidence to prove the latter will often tend to negate the former," *Martin v. Ohio,* 480 U.S. at 234, 107 S.Ct. at 1102, but this overlap did not shift to Johnson the burden of proof on any element of the crime of witness tampering, nor did it allow the jury to presume elements of the government's case. Thus, the jury instruction was well within constitutional parameters.

Indeed, the complaint of overlap (at least with regard to the conduct elements) which Johnson now raises was created by his own hand. As we have recognized above, congress meant for the affirmative defense of truth-seeking to have narrow application, as it was "intended primarily" to protect judges and officers of the court from prosecution for threatening a witness with a perjury or false-statement prosecution. In this case, the conduct which the government alleged to violate § 1512(b)(2)(A) was Johnson's threats of violence against Maydwell and Smith. This conduct, if proven, would have been *per se* "unlawful" conduct under New York law, as it would have run afoul of the harassment statute, N.Y. Penal Law § 240.25. Since the government had to prove this conduct beyond a reasonable doubt, a denial of Johnson's request to charge the affirmative defense would not have been error.

Section 1512 contemplates a number of factual situations where the conduct which the government must prove is *per se* unlawful conduct. *See, e.g.,* 18 U.S.C. § 1512(a)(1) ("kills or attempts to kill"). The facts of this case are similar and they suggest that the defendant might have

been better off *not* requesting a charge on the affirmative defense, and arguing to the jury that the government had not met its burden of proving the conduct element of the offense beyond a reasonable doubt. Instead, Johnson made a tactical choice in favor of the affirmative defense, perhaps in order to take advantage of his claim that he wanted the witnesses to testify truthfully. In any event, any confusion that may have been created by the affirmative defense charge was a result of Johnson's own request, and a litigant may not assign as error a jury charge that he himself requested. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless *that party* objects thereto before the jury retires") (emphasis added).

We do note that other courts have struggled with the constitutionality of the affirmative defense contained in 18 U.S.C. § 1512. *See United States v. Clemons,* 843 F.2d 741, 752–53 (3d Cir.), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988); *United States v. Kalevas,* 622 F.Supp. 1523, 1526–27 (S.D.N.Y.1985). One commentator has argued that "absent narrowing judicial interpretation, at least one innovation of [§ 1512]—shifting the burden of persuasion to the defendant on certain issues—will not withstand attack under the due process clause." William H. Jeffress, *The New Federal Witness Tampering Statute,* 22 Am.Crim.L.Rev. 1, 1 (1984) (Jeffress). Indeed, § 1321(3)(a) of the Final Report of the National Commission on Reform of Federal Criminal Laws (1971), on which the affirmative defense was based, contained substantially the same language as current § 1512(d), but made it a defense, rather than an affirmative defense, with the burden of proof on the government, not the defendant. *See United States v. Clemons,* 843 F.2d at 753 (citing Jeffress, 22 Am.Crim.L.Rev. at 16); *see also* 1982 U.S.C.C.A.N. at 2525. The legislative history of the act indicates that the usual hearings and "markup procedures" were largely dispensed with, because "the Justice Department wanted it in a hurry at the end of [the legislative] session." 128 Cong. Rec. H8468 (1982) (remarks of Rep. Kind-

ness). One representative commented on "what a lousy way this is to legislate." Jeffress, 22 Am.Crim.L.Rev. at 3.

While the National Commission's proposal might have been a wiser and fairer policy choice, and congress might have better drafted § 1512, those decisions are not ours. In light of our construction of § 1512, which avoids the constitutional difficulties foreseen by these judicial and academic writers, *see, e.g., FEC v. Political Contributions Data, Inc.,* 943 F.2d 190, 191 (2d Cir.1991) ("we are obliged to construe statutes to avoid constitutional problems whenever possible"), we see no constitutional defect either in the statute or in Judge Leval's charge. Accordingly, we decline to disturb Johnson's witness-tampering convictions.

**B. *The sentence.***

■ Johnson also challenges the district court's decision to impose a two-level enhancement to his guideline sentence based on Judge Leval's conclusion that Johnson had suborned the perjurious testimony of his tattoo artist. Citing *United States v. Bonds,* 933 F.2d 152 (2d Cir.1991) (*per curiam*) and *United States v. Dunnigan,* 944 F.2d 178, *reh'g in banc denied by an equally-divided court,* 950 F.2d 149 (4th Cir.1991) (Wilkins, J., dissenting), *cert. granted,* —— U.S. ——, 112 S.Ct. 2272, 119 L.Ed.2d 199 (1992), Johnson contends that since the jury's verdict did not necessarily reflect a finding of obstruction, which Johnson claims is a constitutional *sine qua non* to an obstruction of justice enhancement, the § 3C1.1 enhancement cannot stand. We reject this argument.

■ Guideline § 3C1.1 provides:
If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
U.S.S.G. § 3C1.1 (emphasis in original). Application note 3(a) indicates that § 3C1.1 applies to suborning perjury. We review the district court's ultimate conclusion to impose an enhancement *de novo,* but the

facts found to underly this conclusion are subject to the usual "clearly-erroneous" standard of review. *See United States v. Perdomo,* 927 F.2d 111, 118 (2d Cir.1991). Application note 1, on which Johnson places so much reliance, "instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." *United States v. Thomas–Hamilton,* 907 F.2d 282, 285 (2d Cir.1990) (quoting *United States v. Franco–Torres,* 869 F.2d 797, 801 (5th Cir.1989) (internal quotations omitted)). *See also United States v. Shoulberg,* 895 F.2d 882, 885 (2d Cir.1990) ("the commentary does not preclude a finding of a threat any time the defendant can conjure up some conceivable alternative explanation for his words.").

Here, after weighing the evidence, Judge Leval had very firm convictions. He found "(a) that the testimony of Mirando was false; (b) that that falseness was intended to help the defendant; and, (c) that that falseness was suggested by the defendant in these very conversations with Mirando." Judge Leval went on to state that he, "as the finder of fact, would find, even if I were faced by a clear and convincing test that the defendant was suborning perjury and that Mirando responded by delivering perjury in the trial." These findings are not clearly erroneous, and support the conclusion that Johnson suborned perjury, in contravention of § 3C1.1, thus meriting the two-level enhancement to his offense level.

*Dunnigan* and *Bonds* do not counsel a different result. The former is inapposite for two reasons. First and foremost, it is not the law of the second circuit. In *Dunnigan,* the fourth circuit held that enhancing a defendant's sentence under U.S.S.G. § 3C1.1 based on a finding that the defendant testified untruthfully at trial places an "intolerable burden upon the defendant's right to testify in his own behalf." 944 F.2d at 185. Even the fourth circuit noted, *id.* at 184, that we held to the contrary in *United States v. Matos,* 907 F.2d 274, 276 (2d Cir.1990) (such an enhancement "does not, as appellant contends, unconstitutionally chill the exercise of the right to testi-

fy."). Second, the § 3C1.1 enhancement imposed here was not for perjury, but for suborning the perjury of witness Mirando. Even were we so compelled by *Dunnigan* as to make it the law of the second circuit (which we are not, although the Supreme Court may disagree next term when it decides *Dunnigan*), it cannot be said that imposing the enhancement here would chill the *defendant's* constitutional right to testify. Thus, *Dunnigan* is not only not controlling law, it is irrelevant law.

Johnson's reading of *Bonds* is similarly deficient. Hanging his hat on a portion of U.S.S.G. § 3C1.1 comment. (n. 1) ("In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant."), Johnson argues that our sentencing "jurisprudence" in general, and *Bonds* in particular, stand for this proposition: The § 3C1.1 enhancement may be applied only when there is "no explanation for the inconsistency between the verdict and the defendant's testimony other than purposeful perjury."

This analysis fails for numerous reasons. First, application note 1 refers only to testimony and statements by a defendant, not by an alibi witness. In the circumstances presented by this case, there was no burden placed on Johnson's right to testify in his own defense, which is the concern expressed in application note 1. Second, *Bonds* stands for a much less startling proposition: "a judgment of conviction *alone* would ordinarily be an insufficient basis for imposing a section 3C1.1 upgrade". *United States v. Bonds*, 933 F.2d at 155 (emphasis added). This is a far cry from Johnson's reading. The third, and perhaps most fundamental, flaw in Johnson's analysis is that it rests upon an unnecessarily restrictive view of sentencing under the guidelines. Were the law as Johnson suggests, district judges would be substantially deprived of fact-finding power, even when the judge has observed the witness at trial and holds a firm and abiding belief that a witness has lied on the witness stand. The sentencing guidelines were not intended to turn judges entirely into sentencing automatons devoid of fact-finding powers, and we refuse to read them as such. We therefore decline to disturb Johnson's sentence.

## CONCLUSION

The judgment of the district court is affirmed.