**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Oluremi ADEBAYO and Christopher A. Davis, Defendants–Appellants.**

**Nos. 91–2138, 91–2226.**

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1992.

Decided Feb. 5, 1993.

As Amended Feb. 9, 1993.

Barry R. Elden, Asst. U.S. Atty., Haywood E. McDuffie (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

William J. Stevens, Chicago, IL (argued), for Christopher A. Davis.

Paul M. Brayman, Chicago, IL (argued), for Oluremi Adebayo.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Christopher A. Davis and Oluremi S. Adebayo were arrested and subsequently indicted on one count of conspiring to possess with intent to distribute heroin in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). The district court granted Adebayo's motion to sever his trial from Davis'. Davis was convicted on both counts and the district court sentenced him to concurrent terms of 78 months imprisonment on each count. Adebayo was convicted on the conspiracy count only and was sentenced to 70 months imprisonment. Both defendants appeal their convictions. Davis also argues that his sentence should be vacated. We affirm.

## I.

### A. Factual Background

We set out only the facts relevant to the issues raised on appeal. On the morning of June 15, 1990, a United States Customs agent based in New York informed the United States Drug Enforcement Administration in Chicago ("DEA") and officers of the Chicago Police Department Transporta-

tion Group Task Force ("Task Force")[1] of an anonymous tip that a man named Tunde Williams would arrive in Chicago at 11:55 a.m. on Midway Airlines Flight No. 932 carrying heroin. The tip described the heroin smuggler as a "black male, approximately 5' 11", wearing a striped jacket and slacks." Agents Robert Glynn and Michael Bobko, after arriving at Midway Airport, confirmed through the airline that a man using the name "T. Williams" was on Midway flight 932 and his traveling companion was referred to as "S. Ade." Glynn, Bobko and agents Richard Ludowig and Patrick Flaherty positioned themselves in the gate area for flight 932 to observe as the passengers deplaned.

The agents and the defendants gave sharply different accounts of the events which followed. According to the defendants, Adebayo deplaned ahead of Davis, and walked directly to a pay phone to make a five-second call to obtain an address. Davis explained that he left the plane after Adebayo because he was delayed placing Adebayo's address book in his brief case. Davis claims that when he stepped out into the gate area, he walked past Adebayo and headed for the airport's security checkpoint exit. Adebayo says he followed behind. Davis stopped at a newsstand to buy gum and then headed outside towards a taxi stand, with Adebayo following 10 to 15 feet behind. The defendants claim they had previously agreed to meet at the taxi stand.

The agents, in contrast, testified that a man matching the description they had received of the smuggler (a black male, approximately 5' 11", wearing a striped jacket and slacks) was the tenth or twelfth person to deplane. They later positively identified that passenger as Christopher A. Davis, and not "Tunde Williams", the name given by the anonymous informant. The agents say Davis took 10 or 12 steps, stopped, turned his head, and looked back towards the plane's exit. A few passengers later, Oluremi Adebayo emerged, walked towards Davis, made eye contact with him, and directed Davis with a head gesture to proceed down the concourse. Davis complied with the direction, and Adebayo followed behind. Adebayo stopped at a phone near the gate area, held the receiver in his hand for less than a minute while watching Davis proceed down the walkway. The agents say Adebayo never made a phone call. Adebayo hung up the phone and followed Davis through the security exit. He followed Davis for a few more seconds and then nodded to him to proceed through an exit door. Davis complied and he followed him out the exit door.

The agents and the defendants also disagree about what happened once Adebayo and Davis walked outside the airport terminal. The agents' account is as follows: Two agents approached Davis, identified themselves as narcotics officers, and asked if they could speak with him. Davis told the agents he did not have any drugs, and agreed to speak with them. The agents asked Davis his name and requested identification. Davis gave them his drivers license. The agents noticed that Davis appeared extremely nervous as they asked him (Davis) for his plane ticket. He responded that he did not have one, but acknowledged that he had been on the flight from New York. The agents then told Davis that he was not under arrest and was free to go. Next, the agents asked Davis if the briefcase he was carrying was his and if he had packed it himself. Davis answered yes to both questions. The agents told Davis that they did not have a warrant but were asking permission to search his briefcase and were asking whether he was carrying drugs. They informed Davis that he did not have to consent to the briefcase search because they did not have a warrant for him. Nevertheless, he consented to the briefcase search. The agents found two airline tickets in the briefcase in the names of "S. Ade and T. Williams." The tickets indicated that "S. Ade" had paid cash for the tickets and that the two passengers had adjoining seats. When the agents asked Davis if the tickets were his, he answered, "No, yes, I don't know." One agent than asked Davis if he had drugs on his person and if he would

**1.** We will refer to the officers and agents collec-   tively as the "agents".

consent to a search of his "outer garment". Davis verbally consented to this search and opened his jacket. One agent felt the jacket and discovered a packet he recognized to be of a kind used in narcotics trafficking. Davis was placed under arrest, and a more thorough pat down disclosed three more packets in his waist band. The packets were later analyzed and determined to contain heroin.

Davis' version of his encounter with the agents outside the terminal building is markedly different. According to Davis, as he left the terminal and headed towards the taxi stand, two men flashing DEA credentials approached him, identified themselves as DEA agents and told him they believed he was carrying illegal drugs. One agent stepped in front of Davis, and said he wanted to search him. The agent took hold of Davis' left hand, took Davis' briefcase from his right hand, and gave the briefcase to the other agent, who proceeded to search it. One of the agents then said he was going to search Davis' person. Davis remained silent but "presented his jacket". The agent put his hand in Davis' jacket and found a heroin packet. The agents arrested Davis and read him his rights. The subsequent search revealed three more heroin packets hidden in his waistband. Davis concedes that the agents were in plainclothes and did not display any weapons during their encounter. He admits that when the agents asked if they could talk with him he said "yeah." He also admits that in response to the agent's questions he told them that he had flown in from New York, that the briefcase he was carrying was his, and that he had packed its contents. He denies giving the officers' permission to search his briefcase or his jacket, and denies that he was ever told during the encounter that he had the right to discontinue the questioning and that he was free to leave. He also denies that the airline tickets were found during the first search of his briefcase, and maintains that the agents found them only after he was arrested.

Two other agents had approached Adebayo while their colleagues were busy with Davis. Once these agents learned of the discovery of the heroin on Davis, they arrested Adebayo as well.

## B. Proceedings

Both Davis and Adebayo filed motions to suppress the evidence obtained in connection with their arrests. Each of the defendants individually contend that when he was approached by agents outside the airport terminal building, he was "seized" within the meaning of the Fourth Amendment to the United States Constitution and that the agents did not have sufficient grounds to justify the seizure. After conducting a hearing on the defendants' motions to suppress, a magistrate judge recommended that the district court deny Adebayo's motion, but grant Davis' motion on the grounds that prior to his arrest Davis was seized by the agents in violation of the Fourth Amendment. The district court adopted the magistrate judge's recommendation that Adebayo's motion be denied, but overruled the recommendation that Davis' motion be granted. The district court concluded that "to the extent Davis' pre-arrest encounter with law enforcement officials rose to the level of a seizure implicating his Fourth Amendment rights, it amounted to a proper investigatory stop of the type permitted by *Terry v. Ohio*, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968)." The district court also ordered an evidentiary hearing to determine whether Davis consented to the pre-arrest search of his briefcase and jacket. These searches produced the airline tickets and containers of heroin which supplied the probable cause needed to arrest Davis and Adebayo. After the evidentiary hearing, the district court stated that "[h]aving thoroughly reviewed the transcript of the evidentiary hearing conducted by the Magistrate, and having personally heard the testimony of Davis and [the agents] and observed their demeanor, the Court finds that Davis did voluntarily consent to the searches of his briefcase and jacket."

## II. Davis' Appeal

### A.

■ Davis appeals the district court's denial of his motion to suppress the evidence

gathered against him at the airport, arguing that it was obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. As we outlined above, Davis and the agents gave sharply differing accounts of their airport encounter. The district court's ruling on the suppression motion turned largely on its determination that the agents' account was far more credible than Davis'. The district court found Davis' testimony at the suppression hearings to be "incredible" because it was "riddled with inconsistencies and allegations which are simply implausible." In particular, the district court rejected Davis' claim that the agents grabbed his arm and his briefcase early in the encounter and that they subsequently searched the briefcase and Davis' jacket without requesting much less receiving his consent. The court refused to accept Davis' story and instead credited the testimony of the agents that the encounter between Davis and the agents was consensual at the outset and that Davis was informed he was not under arrest and was free to leave. The court also found that Davis consented to the search of his briefcase after the agents informed him that he could refuse the search, and that the search of the briefcase yielded the two airline tickets in names of T. Williams and S. Ade. The court determined that the agents then sought Davis' permission to search his jacket and that Davis signalled his consent to that search by raising his arms and by stating "Go ahead" or "words to that effect". We hold that the district court's factual findings are amply supported in the record and will "not retry issues of fact or substitute our judgment with respect to such issues for that of the trial court." *United States v. Espinosa–Alvarez,* 839 F.2d 1201, 1206 n. 3 (7th Cir. 1987).

Having accepted the district court's factual findings, we turn now to our review of the district court's application of the law controlling these set of facts. We begin by noting that we will not disturb a district court's denial of a motion to suppress evidence unless that denial was clearly erroneous. *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992); *United States v. Williams,* 945 F.2d 192, 195 (7th Cir.1991); *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991); *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990).[2] In reviewing a district court's ruling on a suppression motion, we must remember that "[o]ur inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Johnson,* 910 F.2d at 1508 (quoting *Edwards,* 898 F.2d at 1276).

It is axiomatic, and the law is very clear, that not every encounter between the police and a citizen is a seizure under the Fourth Amendment. *Withers,* 972 F.2d at 841; *Williams,* 945 F.2d at 195. The courts have developed three categories for analyzing police-citizen encounters under the Fourth Amendment:

"The first category is an arrest, for which the Fourth Amendment requires that the police have probable cause to believe that a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no

**2.** In *United States v. Holifield,* 956 F.2d 665, 667 (7th Cir.1992), we observed that this court had, on occasion, implied that legal determinations made by district courts in suppression hearings should be reviewed *de novo* rather than for clear error. The cases cited in *Holifield* suggesting that the *de novo* standard of review was appropriate all involved review of district court determinations concerning whether probable

cause existed for an arrest, an issue not presented in the instant appeal. *Id.* Moreover, we recently addressed this inconsistency in our cases by holding that probable cause determinations, like all other Fourth Amendment reasonable search rulings, should be reviewed for clear error only. *United States v. Spears,* 965 F.2d 262, 268–271 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992).

restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment."

*Withers,* 972 F.2d at 841 (quoting *Johnson,* 910 F.2d at 1508).

In the instant case, the district court concluded that, at least until the agents asked Davis if he was carrying drugs and requested to search his briefcase, the encounter between Davis and the agents was not a Fourth Amendment seizure. Instead, the initial encounter was an example of category three discussed in *Withers* in that it involved the agents' seeking Davis' voluntary cooperation through non-coercive questioning. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Withers,* 972 F.2d at 841 (quoting *United States v. Teslim,* 869 F.2d 316, 321 (7th Cir.1989)); *see also Edwards,* 898 F.2d at 1276; *Espinosa–Alvarez,* 839 F.2d at 1205.[3] "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Williams,* 945 F.2d at 196; *see also Edwards,* 898 F.2d at 1276.

■ We agree with the district court's conclusion that, at least until the agents asked Davis whether he was carrying drugs and whether they could search his briefcase, a reasonable person in Davis' position would have believed he was free to leave. The factors we consider in determining whether a police/citizen encounter

was consensual include, *inter alia,* whether the encounter occurred in a public or private place; whether the suspect consented to talk with the law enforcement agents; whether the agents informed the suspect that he was not under arrest and was free to leave; whether the agents removed the suspect to another area; the threatening presence of several officers; the display of a weapon by an officer; and some physical touching of the suspect. *Withers,* 972 F.2d at 842. As the district court found, the encounter occurred in a public area; Davis consented to speak with the agents; the agents explicitly informed him that he was not under arrest, was free to leave, and could refuse to speak with them; the agents, wearing plainclothes, never displayed a weapon; and the agents did not touch Davis. "The police 'do not violate the fourth amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Johnson,* 910 F.2d at 1508 (citation omitted); *see also Williams,* 945 F.2d at 195. The district court correctly concluded that initial encounter between Davis and the agents was a consensual one.

However, a "consensual encounter can develop into an investigatory detention as a consequence of police behavior." *Withers,* 972 F.2d at 842. The magistrate judge determined that once the agents asked Davis whether he was carrying drugs and requested to search his briefcase, the agents seized Davis for Fourth Amendment purposes. Davis argued in the district court that the magistrate judge's conclusion was correct; the Government ar-

---

3. We have recently noted that in *California v. Hodari D.,* — U.S. —, —, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), the Supreme Court held that whether a reasonable person being questioned by the police would have believed that he was not free to leave "states a necessary, but not a sufficient, condition for seizure." *Tom v. Voida,* 963 F.2d 952, 957 (7th Cir.1992). "A seizure requires not only that the reasonable person feel unfree to leave, but also that the subject actually yield to a show of authority from the police or be physically

touched by the police." *Id.* (citing *Hodari,* — U.S. at —, 111 S.Ct. at 1550). But that additional requirement seems applicable only in cases where an individual has fled from the police and has not been seized by them. *See Voida,* 963 F.2d at 957. In any event, since we agree with the district court that a reasonable person in Davis' position would have felt free to leave during his initial questioning by the agents, we need not address the issue whether Davis yielded to a show of authority from the agents.

gued that those two questions did not convert the consensual encounter into a seizure. The district court refused to decide this question. Instead, it concluded that *even if* the agents' questions did convert the encounter into a Fourth Amendment seizure, the seizure was at most an investigatory stop (category two in the Fourth Amendment analysis set out in *Withers*) fully justified by the attendant circumstances.

Davis cites *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986), in support of his argument that his consensual encounter with the agents ripened into a Fourth Amendment seizure. In *Borys*, we held that when DEA agents informed an individual in an airport terminal that they "suspected [he was] transporting drugs and asked permission to search his luggage," what had previously been a consensual encounter became an investigatory stop. *Id.* at 311. We reasoned that once the individual "knew that the agents had positively identified him as a suspect, a reasonable person would not have felt at liberty to leave." *Id.* In *United States v. Palen*, 793 F.2d 853, 857 (7th Cir.1986), *Borys* was read as holding that if an agent informs an individual that he is conducting a drug investigation and then asks the individual if has any drugs in his possession, an investigatory stop has been created. However, a panel of the Third Circuit concluded that the "important factor" which convinced the *Borys* panel that a seizure had occurred "was that [the defendant] knew that the agents had positively identified him as a suspect." *United States v. Thame*, 846 F.2d 200, 203 (3d Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988). The Government argues that in cases such as the instant one, where the agents identified themselves and asked whether Davis was carrying drugs, the individual has not been "positively identified ... as a suspect."

■ We need not resolve this dispute over the appropriate reading of *Borys* because we agree with the district court that even assuming that Davis' consensual encounter with the agents was converted into a seizure when they asked about the drugs and the briefcase, Davis' Fourth Amendment rights were not violated. An investigatory stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). The investigative methods that the police use must also be the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500, 103 S.Ct. at 1325. The record reveals that the agents briefly questioned Davis in an exchange that lasted no more than several minutes. Thus, Davis was, at most, subjected to an investigatory stop, not a full blown arrest which is "characterized by highly intrusive or lengthy search or detention." *Teslim*, 869 F.2d at 320–21 n. 6 (citation omitted).

■ An investigatory stop is justified if law enforcement authorities "have specific and articulable facts sufficient to give rise to a reasonable suspicion that" an individual has committed or is committing a crime. *Withers*, 972 F.2d at 841; *see also Espinosa–Alvarez*, 839 F.2d at 1206. In making this determination, a reviewing court must consider the totality of the circumstances surrounding the detention. *Espinosa–Alvarez*, 839 F.2d at 1206. When the agents asked Davis if he was carrying drugs and if they could search his briefcase (the questions which allegedly converted the consensual encounter into a seizure), they had information (1) that an anonymous informant had reported that an individual named Tunde Williams, whose appearance the informant described, would be arriving in Chicago on Midway Airlines flight 932 on June 15, 1990, and would be carrying heroin; (2) that Midway Airlines confirmed that a T. Williams was on flight 932 in the company of another individual; (3) that Davis was on flight 932 and generally seemed to match the description given by the informant; (4) that although Davis and Adebayo had left the airplane separately, they were observed exchanging eye contact and gestures as they proceeded through the terminal, indicating that they were fol-

lowing each other and traveling together; (5) that Davis appeared nervous as the agents questioned him; and (6) that Davis informed the agents that he had no plane ticket although he admitted having just arrived on the flight from New York. These articulable facts supported the reasonable suspicion that Davis was in fact the heroin smuggler identified by the tipster, justifying the agents' investigatory detention of him.

■ Having determined that the agents did not violate Davis' Fourth Amendment rights during their encounter with him, we are left with only one question: whether the district court's finding that Davis had consented to the search of his briefcase and his person was supported by the record. "Consent searches are valid only if the consent was freely and voluntarily given." *United States v. Duran*, 957 F.2d 499, 502 (7th Cir.1992). "The question whether a consent was voluntary, as opposed to the product of duress or coercion, 'is a question of fact to be determined from the totality of the circumstances.'" *Id.* "The government bears the burden of proving voluntariness by a preponderance of the evidence." *Id.* Because the "determination of consent is essentially a factual one, ... we cannot overturn the district court's finding unless it is clearly erroneous." *Palen*, 793 F.2d at 858 (citation omitted); *see also Duran*, 957 F.2d at 502. The district court found that Davis voluntarily consented to the search of his briefcase and his jacket and that his consent was "untainted by duress or coercion." According to the record and the district court's findings of fact, the agents did not, as Davis claimed, grab Davis and his briefcase from him early in their encounter or search his briefcase and jacket without Davis' consent. Instead, the district court determined that the agents informed Davis that he was not under arrest and was free to leave, and that when the agents asked Davis if they could search his briefcase they also informed him that he could refuse their request. Davis was not in police custody, was in a public area, and the police used no force against him. Davis voluntarily consented to the search of the briefcase. The agents then sought

Davis' permission to search his jacket, and Davis signalled his consent to that search by raising his arms and stating "'Go ahead' or words to that effect." Given these findings, amply supported in the record, we cannot say that the district court committed clear error when it determined that Davis voluntarily consented to the search of his jacket and his briefcase.

## B.

Davis also challenges the sentence imposed on him pursuant to the United States Sentencing Guidelines ("U.S.S.G.") by the district court. Davis alleges that the district court erred when it enhanced his base offense level by two points pursuant to U.S.S.G. § 3C1.1. That section instructs courts that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." The district court ordered the two level increase because it determined that Davis had committed perjury when he testified, both at his own trial and later at Adebayo's trial, that he was "unaware that the packages that were secreted on [his] body contained heroin." In *United States v. Lozoya–Morales*, 931 F.2d 1216, 1218–19 (7th Cir. 1991), we held that if a district court makes an "independent factual finding" that a defendant committed perjury in his trial testimony, the court may impose a § 3C1.1 obstruction of justice enhancement. Nevertheless, Davis argues, citing *United States v. Dunnigan*, 944 F.2d 178, 185 (4th Cir.1991), that such an enhancement is unconstitutional because it creates "an intolerable burden upon the defendant's [Fifth Amendment] right to testify in his own behalf." Prior to the *Dunnigan* decision, we held that § 3C1.1 does not infringe any constitutionally protected right when applied to increase the sentence of a defendant who testified untruthfully at trial. *United States v. Contreras*, 937 F.2d 1191, 1194–95 (7th Cir.1991). In *United States v. Jones*, 950 F.2d 1309, 1316 (7th Cir.1991), *cert. denied sub nom. Tolliver v. United*

*States,* —— U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992), we stated that nothing in *Dunnigan* caused us to reconsider the position we adopted in *Contreras.* Davis' argument against his sentence, consisting as it does solely of a citation to *Dunnigan,* fails to provide any grounds for our reconsidering of the court's prior holdings. After reviewing the record and the case law applicable thereto, we uphold the sentence imposed.

■ We note that at least eight circuits (including ours) have upheld against constitutional attacks § 3C1.1 enhancements for perjury. *See Dunnigan,* 944 F.2d at 183 (listing circuits which disagree with its holding); *Contreras,* 937 F.2d at 1194–95. The Supreme Court has granted *certiorari* in *Dunnigan,* —— U.S. ——, 112 S.Ct. 2272, 119 L.Ed.2d 199 (1992), and therefore a resolution of this circuit split should be forthcoming.

### III.  Adebayo's Appeal

■ Adebayo's sole contention on appeal is that we ought to reverse his conviction because of alleged prosecutorial misconduct and remand the case for a new trial. Adebayo's allegation of prosecutorial misconduct stems from the Government's decision to call Davis (who had been convicted the week before at a separate trial) as a witness against Adebayo. Davis testified under a grant of immunity which provided that the statements he made at Adebayo's trial could not be used against him in any subsequent prosecution, with one exception: Davis was expressly told by the district court that he could be prosecuted for perjury if he testified untruthfully.

During the Government's direct examination, Davis testified that Adebayo purchased the plane tickets for their flight to Chicago, that he, Davis, did not know their specific destination in Chicago, and that Adebayo had given him the four packets of heroin he was carrying when he was arrested at the airport. On cross examination by Adebayo's counsel, Davis insisted, as he had at his own trial, that he did not know the packets in his possession contained heroin. As we noted above in discussing the U.S.S.G. § 3C1.1 enhancement, the district court made an explicit finding that Davis committed perjury when he testified at his and Adebayo's trials that he did not know that the packets he was carrying contained heroin. Adebayo does not maintain that the Government deliberately presented perjured testimony by eliciting statements from Davis that it knew were untrue. He does argue, however, that because Davis lied about his knowledge of the contents of the packets at his own trial, the Government should have known that he was likely to lie about other matters and thus should not have called upon him to testify against Adebayo.

In *United States v. Guadagno,* 970 F.2d 214, 220 (7th Cir.1992) (citation omitted), we set out the law applicable to claims such as Adebayo's:

"We review the denial of a motion for a new trial based on the prosecution's alleged use of perjured testimony under an abuse of discretion standard. *United States v. Kaufmann,* 803 F.2d 289, 291 (7th Cir.1986). We will not disturb the trial court's ruling on the motion 'unless there has been an error of law or a clear and manifest abuse of judicial discretion.' *Kaufmann,* 803 F.2d at 291 (quoting *United States v. Nero,* 733 F.2d 1197, 1202 (7th Cir.1984)).

"A new trial should be ordered, on the basis of the prosecution's use of perjured testimony, if the defendant establishes that 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury. *Kaufmann,* 803 F.2d at 291. *See Napue v. Illinois,* 360 U.S. 264, 269–71, 79 S.Ct. 1173, 1177–78, 3 L.Ed.2d 1217 (1959)."

*See also United States v. Verser,* 916 F.2d 1268, 1271 (7th Cir.1990).

Given this standard, Adebayo does not merit a new trial. As to the first requirement set out above, Adebayo has failed to demonstrate that the perjured testimony about which he protests was part of *the Government's case.* The Government's di-

rect examination of Davis elicited only that Adebayo purchased the plane tickets to Chicago, that Davis did not know their precise destination in Chicago, and that Adebayo gave Davis the packets (later determined to contain heroin) he was carrying when he was arrested. The Government had expressly informed the district court and Adebayo's attorney that its direct examination of Davis would be limited to those topics to ensure that he would say nothing that the Government considered untruthful. The Government proceeded in this manner so as not to allow Davis to state that he did not know the packets that he was carrying on the plane were filled with heroin. It was *Adebayo's* attorney who, on cross examination, elicited from Davis his perjurious assertion that he was unaware of the contents of the heroin packets. Thus, not only did the Government present no perjured testimony in its own case, it did not know, nor did it have any reason to believe (the second requirement for a new trial), that Davis would perjure himself during cross examination.

Finally, Adebayo fails to meet the third requirement set out in *Guadagno* for a new trial: a showing that Davis' perjury affected the judgment of the jury. Adebayo has been able to demonstrate nothing more than that Davis lied when he asserted he was unaware of the contents of the heroin packets. But Davis' knowledge of the packets' contents was irrelevant to Adebayo's conviction. What was relevant was Davis' testimony that Adebayo gave him the packets which the police later determined contained heroin and that Adebayo masterminded the trip to Chicago. Adebayo has made no showing that *this* testimony was false. Instead, he reasons that because Davis lied at his own trial (about his knowledge of the packets' contents), he was discredited as a witness and should not have been permitted to testify against Adebayo.

Such an argument is wasted on an appellate court. The district judge stated before allowing Davis to testify that Adebayo's counsel would "have total leeway in cross examination" of Davis, adding that "it is going to be a new definition of the word 'leeway'." Adebayo's attorney took full advantage of this opportunity, mounting a vigorous and lengthy attack on Davis' credibility. Moreover, just before Davis' direct testimony, the district court informed the jury that Davis had "previously been found guilty of crimes arising out of the same occurrence for which the defendant is now on trial. You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care." Despite the district court's cautionary words and a searching cross examination, the jury "which is the only entity entitled to make such credibility determinations, apparently decided to believe [Davis'] testimony" that Adebayo was the source of the heroin packets and the mastermind behind the trip to Chicago. *United States v. Aguilar,* 948 F.2d 392, 397 n. 6 (7th Cir.1991). The jury was free to reach this conclusion, and we decline Adebayo's invitation to second-guess its credibility determinations.

## IV.

For the foregoing reasons, Davis' and Adebayo's convictions and sentences are AFFIRMED.