In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2982

UNITED STATES OF AMERICA

*Plaintiff-Appellee,*

*v.*

DONTRAY A. SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:13-cr-136 — **Rudolph T. Randa,** *Judge.*

ARGUED APRIL 17, 2015 — DECIDED JULY 20, 2015

Before POSNER and WILLIAMS, *Circuit Judges,* and WOOD, *District Judge.*[*]

WILLIAMS, *Circuit Judge.* Two Milwaukee Police Department officers on bicycle patrol were investigating gunshots around 16th and Center Street. They saw Dontray Smith

---

[*] Of the United States District Court for the Northern District of Illinois, sitting by designation.

crossing 16th Street as he prepared to enter an alley. The officers rode ahead of Smith into the alley and when they were five feet from Smith, they stopped and positioned their bicycles at a 45-degree angle to him. One officer dismounted, approached Smith, and asked whether he had a gun or any other weapon in his possession. When Smith indicated that he had a gun, the officers confiscated it and arrested him.

Smith was indicted for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). He filed a suppression motion alleging evidence to be used against him—his statement to the officers and the gun they confiscated—was obtained through an unreasonable seizure in violation of his Fourth Amendment rights. The district court found that Smith's encounter with the officers was consensual, and no seizure had occurred. Smith entered a conditional plea agreement, retaining the right to appeal the denial of his motion to suppress. After being sentenced to 37 months' imprisonment and three years of supervised release, Smith appeals. He argues that his encounter with the officers cannot be treated as consensual because a reasonable person in his situation would not have felt free to ignore the police and go about his business. We agree that in light of all the circumstances surrounding the encounter, Smith was seized by the officers. Since he was seized without reasonable suspicion, Smith's Fourth Amendment rights were violated. Therefore, the district court erred by not suppressing the evidence, and we reverse.

## I. BACKGROUND

On June 6, 2013, Michael Michalski and Michael Flannery, Milwaukee Police Department officers, were on bicycle patrol in the vicinity of North and Teutonia Avenues. At

around 10 p.m., the officers heard three to four gunshots fired north of their location. They did not call dispatch to report the shots fired. Instead, they rode their bicycles to 2600 North 15th Street where they spoke with a witness who reported that he heard gunshots west of his location. The officers made no further inquiries of this witness and did not ask whether he possessed a weapon.

The officers rode one block west on Clarke Street and turned north on North 16th Street towards Center Street. In this residential area, they saw Dontray Smith crossing North 16th Street. Smith, a resident of the neighborhood, had just left an alley on the east side of the street and was preparing to enter an alley on the west side. He was not running or engaging in any other suspicious behavior, nor was he coming from the direction where the shots were reportedly fired.

The officers rode ahead of Smith into the alley. When the officers were roughly 20 feet in front of Smith (and all were in the alley), they made a U-turn to face Smith and began closing the distance. They stopped approximately five feet in front of Smith, positioning their bicycles at a 45-degree angle to face him. Neither Michalski nor Flannery identified himself as an officer, said hello, or asked Smith for identifying information. Officer Michalski got off his bicycle and approached Smith with his hand on his gun.[1] He asked Smith, "Are you in possession of any guns, knives, weapons, or anything illegal?"

---

[1] At the suppression hearing, Officer Michalski testified that he was trained to approach someone suspected of having a firearm with a hand on his weapon and that this training would have been part of his behavior on the evening of the officers' encounter with Smith.

According to the officers, Smith then "nodded towards like his right side, his head down, and he said 'Yes, I have a gun.'" At this point, Officer Flannery got off his bicycle and asked Smith if he had a concealed weapon permit, to which he responded "no." The officers handcuffed Smith and searched his front pocket to recover a gun. After seizing the gun, the officers obtained Smith's identifying information. At approximately 10:13 p.m., the officers notified dispatch that they had arrested Smith. Officer Michalski recorded the encounter as a "field interview" in the police report.

Smith was indicted for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). He filed a suppression motion alleging his statement to the officers and the gun were obtained through an unreasonable seizure in violation of his Fourth Amendment rights. After an evidentiary hearing, the magistrate judge recommended that his suppression motion be denied because no seizure had occurred and no constitutional interests were implicated. The district court issued an order adopting the magistrate's recommendation. Smith then entered into a conditional plea agreement that allowed him to retain his right to appeal the denial of his motion to suppress. He was sentenced to 37 months' imprisonment and three years of supervised release. This appeal followed.

## II. ANALYSIS

In reviewing the district court's denial of a motion to suppress, we review its factual findings for clear error and legal questions *de novo*. *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012). In this appeal, the sole issue presented is a legal one: whether a police encounter in an alley of the type described above constitutes a "seizure" within the

meaning of the Fourth Amendment. The government conceded at oral argument, and we accept for purposes of this decision, that the officers lacked the reasonable suspicion required to justify a seizure and that, if a seizure took place, the gun found on Smith's person must be suppressed as tainted fruit.

It is well established that a seizure does not occur merely because a police officer approaches an individual and asks him or her questions. *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."); *accord United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002). So long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

The "crucial" test for determining if there has been a seizure is "whether taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 434. While this test is an "objective" one, it is "necessarily imprecise" because "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the

conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573–74 (1988).

Circumstances that suggest a seizure include "the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Courts also consider whether police made statements to the citizen intimating that he or she was a suspect of a crime, *United States v. Borys*, 766 F.2d 304, 311 (7th Cir. 1985), whether the citizen's freedom of movement was intruded upon in some way, *Chesternut*, 486 U.S. at 575, whether the encounter occurred in a public or private place, *United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993), and whether the officers informed the suspect that he or she was free to leave. *Id*. These factors, however, are neither exhaustive nor exclusive. *See Mendenhall*, 446 U.S. at 554 (indicating that such factors are merely "[e]xamples").

With this guidance mind, we turn to the circumstances surrounding the encounter in this case. Smith, while walking alone at night in an alley, was intercepted by two armed, fully uniformed police officers. Leading up to this encounter, the officers waited for Smith to enter the alley, rather than engaging with him on the more open and presumably illuminated street. The officers rode past Smith into the alley and then made a U-turn to face him. When they were five feet from Smith, the officers stopped and positioned their bicycles at a 45-degree angle to him, obstructing his intended

path forward. Officer Michalski dismounted from his bicycle and approached Smith with his hand on his gun. Neither officer introduced himself, engaged in any pleasantries with Smith, or asked Smith for his name. Nor did the officers ask Smith general investigatory questions, such as whether he had heard gunshots. Instead, Officer Michalski posed a single, accusatory question to Smith: "Are you in possession of any guns, knives, weapons, or anything illegal?" Smith was not informed that he was at liberty to ignore the question.

Given these factors—in particular, the location of the encounter in a dark alley, the threatening presence of multiple officers, the aggressive nature of the questioning, and the fact that Smith's freedom of movement was physically obstructed by the positioning of the officers and their bicycles—we conclude that a reasonable person in Smith's situation would not have felt at liberty to ignore the police presence and go about his business. Therefore, we find that Smith was seized for purposes of the Fourth Amendment.

In arguing that this encounter should be treated as a consensual one, the government emphasizes that its location was "public." While it is true that the alley in which Smith was approached is public, the fact remains that alleys are by their nature less travelled and narrower than streets. A citizen approached in an alley will very often be alone, as Smith was, and have limited room in which to maneuver, conditions that may contribute to the reasonable belief that simply walking away from the police is not an option. *See, e.g., United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997) ("When a person is in a confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option."); *cf.*

*United States. v. Drayton*, 536 U.S. 194, 204 (2002) (noting that "a reasonable person may feel … more secure in his or her decision not to cooperate with police on a bus than in other circumstances" because "many fellow passengers are present [on a bus] to witness officers' conduct"). Alleys are distinguishable from the sorts of open, populated spaces in which police questioning is typically deemed consensual. *Compare Florida v. Rodriguez*, 469 U.S. 1, 4 (1984) (no seizure where questioning occurred in "public area of the airport"), *with Royer*, 460 U.S. at 508–09 (questioning in enclosed, windowless room constituted a seizure).[2]

The government also stresses that Smith was not physically touched during the encounter. While the touching of a citizen by an officer is indicative of coercion, *Clements*, 522 F.3d at 794, we disagree with the suggestion that physical contact is required to find that a seizure has taken place. A seizure may transpire any time police conduct "communicate[s] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement." *Chesternut*, 486 U.S. at 575. Such a communication can occur absent physical contact such as when police activate a siren or flashers, or, as in this case, when police act "aggressively to block [a person's] course or to control his direction or speed." *See id.* at 575.

---

[2] Even questioning in the most circumscribed of spaces may be deemed non-coercive if, for example, police explicitly communicate to the citizen that compliance is not required. *See United States v. Thompson*, 106 F.3d 794, 798 (7th Cir. 1997) (rejecting argument there could be no consensual interrogation of citizen in confines on a police squad car where trooper explicitly informed citizen she was free to leave). Here, however, no such message was conveyed to Smith.

The government also contends that no seizure occurred here because the officers did not entirely block Smith's "path" or his "exit" from the alley with their bicycles. According to the government, all Smith had to do to end the encounter was walk "around" or "through" the officers. Common sense dictates that no reasonable person in an alley would feel free to walk "through" two armed officers on bicycles. And our case law makes clear that officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option. In *United States v. Burton*, 441 F.3d 509 (7th Cir. 2006), three police officers approached the defendant's car on their bicycles. *Id*. at 510. One of the officers placed his bicycle in front of the car and the others placed their bikes on either side of it. *Id*. at 510–11. We held that "[i]t [was] a reasonable, in fact a compelling, inference that the police placed their bikes where they did in order to make sure that Burton didn't drive away before they satisfied themselves that there was no criminal activity afoot. By doing this they 'seized' the car, though in a severely attenuated sense." *Id*. at 511. Although it was theoretically possible for Smith, like the defendant in *Burton*, to extricate himself from the situation by reversing course, the officers' positioning nonetheless was sufficient to communicate to a reasonable person that he was not free to leave. *See also United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986) (noting that a reasonable person "bounded on three sides by police patrol cars, would not have believed that he was free to leave"); *Jerez*, 108 F.3d at 692 (noting that a "confined area … contribute[s] to a reasonable belief that ignoring the law enforcement presence is not an option").

Lastly, the government argues that the police did not convey any message to Smith that he was a suspect in an

ongoing investigation. The line between a consensual con-
versation and a seizure is crossed when police convey to an
individual that he or she is suspected of a crime. *See Borys*,
766 F.2d at 311. While the government posits that in order to
convey such a message, police must say "you are a suspect,"
such magic words are not required. Any statement that "in-
timate[s] that an investigation has focused on a specific indi-
vidual easily could induce a reasonable person to believe
that failure to cooperate would lead only to formal deten-
tion." *See id.* at 311 (citing *United States v. Berry*, 670 F.2d 583,
597 (11th Cir. 1982) (en banc)). In other words, courts must
look to the totality of the circumstances when determining
whether an officer's words or conduct have conveyed the
reasonable belief to a citizen that he or she is suspected of a
crime. In the context of this highly charged encounter—
which involved no pleasantries, the cornering of a lone citi-
zen in an alley, and the posing of the sole question, "do you
have a weapon?"—we find that a reasonable person in
Smith's position would believe he or she was suspected of
some criminal wrongdoing, and as such, not at liberty to
walk away.

We note that our assessment is consistent with the offic-
ers' own contemporaneous and subsequent descriptions of
the encounter. In his police report, Officer Michalski de-
scribed the encounter with Smith as a "field interview. A
"field interview," according to the Milwaukee Police De-
partment's Standard Operating Procedure (SOP), is "the
brief detainment of an individual … based on articulable
reasonable suspicion, for the purposes of determining the
individual's identity and resolving the member's suspicions
concerning criminal activity." SOP § 085. In other words, it is
a seizure (a *Terry* stop, to be precise). By contrast, the SOP

defines a "social contact" as a consensual encounter with a citizen for the "purpose of asking questions or … information gathering." *Id*. No reasonable suspicion is required for this sort of encounter, but a "proper introduction" by the officer is recommended. *See id*. ("Police members should safeguard their actions and requests so that a reasonable person does not perceive the contact as a restraint on their freedom. Police members will be respectful, attempt to build rapport, and keep the contact as brief as possible.").[3]

The officers' testimony at the suppression hearing also indicates the coercive nature of the encounter. According to Officer Flannery, Smith was not at liberty to simply walk away from the officers:

> Q. If Mr. Smith looked up to you and said "go screw yourself" and kept walking, would you have considered him to be cooperative?
>
> A. Honestly, not really, no.
>
> Q. And then what would you have done?
>
> A. Probably would have stopped him.

During his testimony, Officer Michalski stated the encounter with Smith was a "field interview," rather than a citizen contact, and suggested that Smith was a suspect in the shooting incident that the officers were investigating that night. He explained that since he had heard gunshots in the

---

[3] The version of the Milwaukee Police Department's SOP governing citizen contacts and field interviews effective at the time of Smith's arrest is available at http://city.milwaukee.gov/ImageLibrary/Groups/cityFPC/agendas3/ 130516_PD_C.pdf (last visited July 1, 2015).

area, "for safety reasons, walking in an alley like that, I'm going to ask someone are they in possession of anything like that—guns, knives, a weapon or something like that." He further clarified that were the encounter a consensual "citizen contact," he would have posed different questions, such as "[d]id you see somebody run through a yard? We're looking for somebody." He reiterated that if he is "going to a shots fired call I'm going to ask that person, 'Do you have a gun on you?'"

The government would have us believe that a "reasonable person" would view this encounter in a manner at odds with how it would be classified by the Milwaukee Police Department's Standard Operating Procedures, how the officers viewed the encounter, and obviously how Smith himself perceived it. We simply cannot ignore the coercive nature of this encounter. Of course, the subjective beliefs and intent of the officers are relevant to the assessment of the Fourth Amendment implications of police conduct only to the extent they have been conveyed to the person confronted. *Mendenhall*, 446 U.S. at 554, n. 6. But in this case, we find that Officers Flannery and Michalski intended to and in fact did communicate to Smith precisely what was going on— that he was a suspect in their investigation and was not free to leave before submitting to their questioning.

Finally, we address Smith's argument that the reasonable person test should take into account Smith's race. Specifically, he contends that no reasonable person in his "position"— as a young black male confronted in a high-crime, high-poverty, minority-dominated urban area where police-citizen relations are strained—would have felt free to walk

away from the encounter with Officers Flannery and Michalski.

The Supreme Court dealt with a similar argument in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). There, the respondent suggested that as "a female and a Negro," she "felt unusually threatened by the officers, who were white males." *Id*. at 558. While the Court stated that these factors "were not irrelevant," it also found they were not "decisive," ruling that the totality of the evidence demonstrated voluntarily consent to police questioning. *Id*.

We do not deny the relevance of race in everyday police encounters with citizens in Milwaukee and around the country. Nor we do we ignore empirical data demonstrating the existence of racial profiling, police brutality, and other racial disparities in the criminal justice system. But today we echo the sentiments of the Court in *Mendenhall* that while Smith's race is "not irrelevant" to the question of whether a seizure occurred, it is not dispositive either. Even without taking into account Smith's race, we are able to find on the strength of the other factors discussed that this encounter constituted a seizure.

### III. CONCLUSION

The judgment of the district court is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.