COURT OF APPEALS
DECISION
DATED AND FILED

October 8, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1385-CR**

Cir. Ct. No. 2021CF3574

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

   PLAINTIFF-APPELLANT,

 V.

KAHREEM RASHAH WILKINS, SR.,

   DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Milwaukee County: DANIELLE L. SHELTON, Judge. *Reversed.*

Before White, C.J., Donald, P.J., and Geenen, J.

¶1    DONALD, P.J. The State of Wisconsin appeals from an order granting Kahreem Rashah Wilkins, Sr.'s motion to suppress. Contrary to the trial court, we conclude that the police lawfully approached Wilkins's SUV and

engaged him in conversation. Therefore, we reverse the trial court's order suppressing the evidence.

## BACKGROUND

¶2 Wilkins was charged with one count of possession of a short-barreled shotgun/rifle and three counts of possession of a firearm by a felon. The charges were based on evidence obtained after police conducted a warrantless search of Wilkins's SUV.

¶3 Wilkins moved to suppress the evidence. At a post-briefing hearing, the State presented testimony from Officer Josue Ayala and moved into evidence video footage from his body camera.[1]

¶4 Officer Ayala testified that on August 20, 2021, he was on bicycle patrol with three other officers. As the officers were patrolling the Garden Homes Neighborhood around 2:00 a.m., they observed a black Yukon SUV parked with its engine running.[2] Inside the SUV were two occupants: Wilkins, who was in the front driver's seat, and Wilkins's nephew, who was in the front passenger's seat.

¶5 As Officer Ayala rode past the driver's side of the SUV, he immediately smelled the odor of burnt marijuana coming from the partially opened driver's side window. Officer Ayala stopped his bicycle directly outside of the driver's door, one officer stopped behind Officer Ayala, and the other two

---

[1] We note that the video footage does not capture the initial contact between Officer Ayala and Wilkins. Officer Ayala testified that he manually activated his camera once he felt safe to do so.

[2] According to Officer Ayala, the Garden Homes Neighborhood has "a high amount of shootings, shots fired, ShotSpotters, [and] drug dealing."

officers stopped on the passenger side of the vehicle. Officer Ayala testified that these were the positions they would normally take when conducting a traffic stop or making contact with a vehicle or person.

¶6 As soon as Officer Ayala pulled his bicycle next to the driver's side door, Wilkins looked at him, and they started talking through the partially opened window. Within approximately ten seconds of speaking with Wilkins, Officer Ayala noticed a gun resting in plain view on Wilkins's lap. Officer Ayala also observed a green residue suspected to be marijuana on the right side of the driver's floorboard. Officer Ayala testified that he was able to see inside the vehicle because the area was well lit by streetlights.

¶7 Officer Ayala told Wilkins that he saw the gun and asked if Wilkins had a concealed carry permit. Wilkins informed the officer that he did not have a permit and stated that he was working on getting "things" expunged from his record. Wilkins admitted that he had a conviction for bail jumping and confirmed it was a felony. Wilkins explained that the gun was for protection, not robbing people. Wilkins denied smoking marijuana. While conversing with Officer Ayala, Wilkins smoked a cigarette.

¶8 Based on Wilkins's possession of a firearm as a convicted felon, Officer Ayala removed Wilkins from the SUV and arrested him. The officers then searched the vehicle. The search produced two more firearms: a loaded semi-automatic handgun behind the center console, and a sawed-off shotgun inside a duffel bag in the third-row seating/rear cargo area. Officer Ayala also recovered a small amount of marijuana residue on the front driver's floorboard. The residue tested positive for THC, but due to the small amount was not able to be weighed.

No burnt marijuana was found inside the SUV or in the immediate vicinity of the SUV.

¶9     After hearing argument from counsel, the trial court granted the defense's motion to suppress the evidence in a written decision. First, the trial court found that Officer Ayala's testimony that he smelled a strong odor of burnt marijuana was incredible. The court thus found that the officers did not have reasonable suspicion to stop Wilkins's vehicle and investigate the odor of marijuana. In addition, the court found that the police encounter was not consensual because "four police officers, while in full uniform, stopped their fully marked Milwaukee Police Department bicycles, equipped with emergency red and blue lights, surrounded the [SUV], and without justification leaned into [Wilkins's] windows with flashlights to peer inside…."

¶10    The State now appeals.

**DISCUSSION**

¶11    On appeal, the State challenges the trial court's finding that Officer Ayala's testimony that he smelled a strong odor of burnt marijuana was incredible. According to the State, the evidence elicited at the suppression hearing supports that Officer Ayala smelled burnt marijuana and was "thereby authorized to approach and speak to Wilkins through the partially open window." In the alternative, the State contends that Officer Ayala "could properly speak to Wilkins at the window of his vehicle as part of a consensual police/citizen encounter on a public street."

¶12    Even if we assume the trial court properly found that Officer Ayala did not smell burnt marijuana, we agree with the State that the officers lawfully

approached Wilkins in his SUV and engaged him in conversation as part of a consensual encounter.

¶13 The Fourth Amendment of the United States Constitution and article 1, section 11 of the Wisconsin Constitution provide the right to be free from unreasonable searches and seizures. Wisconsin courts generally construe our state constitutional protections in the same way as the United States Supreme Court has interpreted the Fourth Amendment. *State v. Young*, 2006 WI 98, ¶30, 294 Wis. 2d 1, 717 N.W.2d 729.

¶14 "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *County of Grant v. Vogt*, 2014 WI 76, ¶20, 356 Wis. 2d 343, 850 N.W.2d 253 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The test of whether a person is free to leave is objective, and "considers whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances." *Vogt*, 356 Wis. 2d 343, ¶¶25, 30. This is a "highly fact-bound inquiry." *State v. VanBeek*, 2021 WI 51, ¶29, 397 Wis. 2d 311, 960 N.W.2d 32 (citation omitted).

¶15 Not every police-citizen interaction, however, implicates the Fourth Amendment. *Id.*, ¶26. "Law enforcement officers may approach citizens on the street, put questions to them, and ask for identification without implicating the Fourth Amendment 'as long as the police do not convey a message that compliance with their request is required.'" *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

¶16 When determining whether a person has been seized, we apply a mixed standard of review. *Vogt*, 356 Wis. 2d 343, ¶17. We will uphold the trial court's "findings of fact unless they are clearly erroneous, but the application of constitutional principles to those facts presents a question of law subject to *de novo* review." *Id.* (emphasis added).

¶17 The State contends that under the facts of this case a reasonable person would have felt free to end the encounter up until the point that Officer Ayala saw the gun on Wilkins's lap. Once Officer Ayala saw the gun, this provided reasonable suspicion of criminal activity to investigate the legality of the firearm. Conversely, Wilkins contends that he was seized when the officers "effectively surround[ed]" his vehicle because a reasonable person would not have felt free to leave.

¶18 We agree with the State. When the officers approached Wilkins, he was sitting in a parked SUV with the engine running on a well-lit public street. There was no evidence presented that the officers activated the emergency lights on their bicycles, used forceful language, displayed their firearms, or placed a hand on Wilkins or his nephew. Moreover, the officers did not position their bicycles in front of the SUV, which would have prevented Wilkins from pulling forward and driving away. *See id.*, ¶41 (holding that there was no seizure because the defendant "still could have driven away"). "While it is true that 'most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.'" *State v. Williams*, 2002 WI 94, ¶23, 255 Wis. 2d 1, 646 N.W.2d 834 (citation omitted).

¶19 Wilkins notes that the officers were in "full uniform" and "armed." We do not find these facts remarkable. As the United States Supreme Court has observed:

> Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

*United States v. Drayton*, 536 U.S. 194, 204-05 (2002). Here, there was no evidence presented that any of the officers displayed a firearm or had their hands on a firearm.

¶20 Wilkins also notes that Officer Ayala used a flashlight to illuminate the inside of the SUV. We are not convinced, however, that using a flashlight to illuminate the inside of a vehicle transforms a consensual encounter into a seizure. *See e.g.*, *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (stating that "[t]he act of shining a spotlight on a person's car typically does not constitute a seizure"); *United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) (rejecting an argument that the defendant was seized where the officers stood with flashlights on each side of the defendant's car because the defendant "still could have declined to answer their questions and driven away").

¶21 Lastly, *United States v. Smith*, 794 F.3d 681 (7th Cir. 2015), which Wilkins relies on, is distinguishable. In *Smith*, two bicycle patrol officers, who were armed and wearing full uniforms, were investigating some gunshots when they saw Smith as he was about to enter a dark alley alone. *Id.* at 683-84. Rather than engaging with Smith "on the more open and presumably illuminated street," the officers waited for Smith to enter the alley. *Id.* at 684-85. The officers then

rode past Smith into the alley, made a U-turn to face him, and positioned their bicycles to obstruct Smith's path forward. *Id.* at 685. An officer then approached Smith with his hand on his gun and immediately asked Smith if he had a weapon. *Id.* at 683. The officers considered Smith a suspect in the shooting incident. *Id.* at 686-87. The Seventh Circuit held that Smith was seized as "a reasonable person in Smith's situation would not have felt at liberty to ignore the police presence and go about his business." *Id.* at 685.

¶22 In contrast, here, Wilkins was sitting with his nephew in a large SUV with its motor running on a well-lit public street when the officers approached. The officers, who were on a routine patrol, did not position their bicycles to block the SUV's path forward. *Compare also with **United States v. Burton***, 441 F.3d 509, 510-11 (2006) (holding that police officers seized a car where one of the officers placed his bicycle in front of the car and the others placed their bicycles on either side of the car). Additionally, there was no evidence presented that any of the officers had their hands on their firearms.

¶23 Therefore, under all of the circumstances of this case, we conclude that the police officers' initial interaction with Wilkins was a consensual encounter and not a seizure implicating his Fourth Amendment rights. Wilkins was free to refuse to speak to the officers and leave. *See **Vogt***, 356 Wis. 2d 343, ¶30. Accordingly, we reverse the trial court's order granting suppression.

*By the Court.*—Order reversed.

Not recommended for publication in the official reports.

No. 2023AP1385-CR(D)

¶24 GEENEN, J. (*dissenting*). This case is straightforward, and the facts pertinent to the Majority opinion are accurately summarized. However, I cannot agree that a reasonable person would have believed that he or she was free to leave when four uniformed and armed police officers on marked bicycles surrounded the doors to a running vehicle parked on a city street in a high-crime area at around 2:00 a.m. In my view, these circumstances constitute a seizure because no reasonable person would believe they could simply drive away or exit the vehicle and leave.

¶25 Because I conclude that a seizure occurred, I must also review the circuit court's determination that there was no reasonable suspicion to justify the seizure. The circuit court found that Officer Ayala's testimony that he immediately smelled burnt marijuana before approaching Wilkins's SUV was not credible, and as a consequence, there was no reasonable suspicion to support Wilkins's seizure. Searching the record for evidence that supports this finding, which I must do, I conclude that it is not against the great weight and clear preponderance of the evidence.

¶26 I would affirm the circuit court. Accordingly, I respectfully dissent.

## I. Wilkins was seized.

¶27 The Majority correctly summarizes the applicable legal principles. Majority, ¶¶13-16. The test for whether a person is "seized" is whether, under the totality of the circumstances, a reasonable person would have believed that he or

she was not free to leave. *County of Grant v. Vogt*, 2014 WI 76, ¶20, 356 Wis. 2d 343, 850 N.W.2d 253.

¶28     These are the circumstances in this case:  It was around 2:00 a.m. in a high-crime area of Milwaukee; the vehicle, a large SUV, was parked on a city street with its engine running; four uniformed and visibly armed police officers on marked bicycles positioned themselves around the SUV, two on the driver's side and two on the passenger's side; the position taken by the police officers is the same one used when they initiate a traffic stop.

¶29     No reasonable person I can imagine would feel free to drive away under these circumstances.  A reasonable person would be concerned that driving away could be viewed as violating a traffic law or a law regarding fleeing or endangering an officer,[1] especially considering that Officer Ayala testified that he was close enough to the SUV to see an amount of green residue on the driver's floorboard by Wilkins's feet that was so insubstantial that it could not be weighed.

¶30     Similarly, no reasonable person would believe they could exit the vehicle and leave the scene.  Police officers were blocking both the driver and front passenger door, and if the neighborhood did indeed have a high rate of drug deals and shootings as Officer Ayala testified, getting out of the vehicle after it has been approached and surrounded by four police officers could, perhaps reasonably, be viewed as threatening.

---

[1] Given the size of the SUV, the positioning of the police officers, and their proximity to the SUV, a reasonable person would be concerned that driving off would *actually* endanger the officers' safety.

¶31 While it is true that the cases relied upon by Wilkins do not precisely mirror the facts presented in the instant case, *see, e.g.*, **United States v. Smith**, 794 F.3d 681 (7th Cir. 2015), the existence of a case factually identical to the one being considered on appeal is not the test. I am not persuaded that driving away or exiting the SUV were realistic or reasonable options considering the totality of the circumstances presented in this case, or that an *actual* reasonable person living in the real world would feel free to leave under these circumstances.[2]

## II. The circuit court's findings are not against the great weight and clear preponderance of the evidence.

¶32 Because I conclude that Wilkins was seized, I must also review the circuit court's determination that there was no reasonable suspicion to justify the seizure. In this case, the circuit court essentially found that Officer Ayala did not immediately smell burnt marijuana coming from the SUV before approaching it, and therefore, he lacked reasonable suspicion to seize Wilkins.

¶33 In resolving a motion to suppress evidence, "[a]ll issues of fact arising out of such motion shall be tried by the court without a jury." WIS. STAT. § 971.31(4). When a circuit court sits as the fact-finder, its findings are entitled to great deference. **State v. Moore**, 2023 WI 50, ¶8, 408 Wis. 2d 16, 991 N.W.2d 412. Findings of fact made by the circuit court may be upset on appeal only if "they are against the great weight and clear preponderance of the evidence." **State v. McGill**, 2000 WI 38, ¶17, 234 Wis. 2d 560, 609 N.W.2d 795.

---

[2] Studies demonstrate that the mythical "reasonable person" who exists only in judicial decisions does not generally reflect what real, everyday people think and how they act when approached by law enforcement officers. **County of Grant v. Vogt**, 2014 WI 76, ¶71 & nn. 5-6, 356 Wis. 2d 343, 850 N.W.2d 253 (Abrahamson, J., dissenting) (collecting studies). This case presents an example of the world of legal decisions failing to reflect the real world. *See id.*

3

¶34 Appellate courts cannot "'reweigh the evidence or reassess the witnesses' credibility[.]'" *State v. Young*, 2009 WI App 22, ¶17, 316 Wis. 2d 114, 762 N.W.2d 736 (citation omitted). Instead, reviewing courts must "'search the record for evidence that supports findings the [circuit] court made, not for findings it could have made but did not.'" *Id.* (citation omitted). If more than one inference can be drawn from the credible evidence, "the reviewing court must accept the inference drawn by the trier of fact[,]" and when there is a dispute about a fact, "the [circuit court] is the ultimate arbiter of the credibility of the witnesses." *Cogswell v. Robershaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979).

¶35 I conclude that the record supports the circuit court's findings. Although the circuit court mistakenly found that the green residue found on the driver's floorboard did not test positive for THC, all of its other findings are supported by the record and are adequate to support its order granting the motion to suppress. The circuit court disbelieved that Officer Ayala immediately smelled burnt marijuana coming from the SUV because there was no evidence corroborating Officer's Ayala's testimony.

¶36 For example, it found that there was no paraphernalia or burnt marijuana inside the SUV. The State argues that this could be because Wilkins and his nephew consumed all of the marijuana and discarded the remnants of their joint or blunt somewhere before parking the SUV, or they could have been smoking marijuana through hollowed out cigarettes. The State's explanation is, at best, a permissible inference that the circuit court could have drawn but did not. The same is true with respect to the State's argument that the circuit court should have found that the presence of an air freshener in the SUV was corroborative

evidence because marijuana users sometimes use air fresheners to mask the smell of marijuana.

¶37 In sum, the State argues that the circuit court should have made various inferences that would have explained the absence of corroborating evidence. It did not do so, and it instead concluded that the lack of corroborating evidence damaged Officer Ayala's credibility. On this record, the circuit court's finding that Officer Ayala did not immediately smell burnt marijuana coming from Wilkins's SUV before he approached it was not against the great weight and clear preponderance of the evidence.[3]

¶38 I would affirm the circuit court's order granting Wilkins's motion to suppress. Accordingly, I respectfully dissent.

---

[3] Although not necessary to my analysis, a central premise giving rise to this appeal may no longer be true, namely, that the odor of marijuana (burnt or unburnt) is "unmistakabl[y the] odor of a controlled substance[.]" *State v. Secrist*, 224 Wis. 2d 201, 218, 589 N.W.2d 387 (1999). Justice Dallet summarized the relevant issues in her dissent in *State v. Moore*, 2023 WI 50, ¶¶28-32, 408 Wis. 2d 16, 991 N.W.2d 412 (Dallet, J., dissenting). This issue continues to be litigated, with the Minnesota Supreme Court holding last year that the odor of marijuana, on its own, is insufficient to create probable cause to conduct a warrantless search of a vehicle. *State v. Torgerson*, 995 N.W.2d 164 (Minn. 2023). This case involves reasonable suspicion, a lower standard than probable cause, and the smell of marijuana indisputably can still signal the possibility of criminal activity, but if the illegal substance (i.e., marijuana) cannot be differentiated from a legal substance (e.g., hemp) by appearance or smell, it is difficult to understand what would make a suspicion of criminal activity reasonable, absent any other relevant factors.